STATE OF NORTH CAROLINA v. LARRY EMMET RUPE

No. 9118SC1140

(Filed 20 April 1993)

1. **Embezzlement § 6 (NCI4th)— refundable reservation deposit for condominium—use of funds for start-up costs—deposits not returned—sufficient evidence of embezzlement**

The evidence of a fiduciary relationship and fraudulent intent was sufficient to support defendant's conviction of embezzlement where it tended to show that defendant was an officer in corporations developing, marketing and managing condominium retirement communities; potential purchasers of a planned condominium project in Greensboro reserved a unit by paying five percent of the purchase price as a deposit; this deposit was fully refundable within 30 days upon written notice by the purchaser; the purchaser was required to pay another five percent when the contract of sale was signed, and the contract provided that the initial reservation deposit was to be held in a savings account until a construction loan

commitment was obtained for the project, at which time the deposit would be returned to the purchaser; defendant controlled the deposit of reservation funds and used these funds to pay various start-up expenses for the project; defendant intended to replace this money through the sale of limited partnership interests in the project; however, the partnerships were not in fact secured, the money was not replaced, and several persons who had reserved units did not receive a refund of their deposits. It is not necessary to show that defendant converted the property to his own use provided the State shows that defendant fraudulently or knowingly and willfully misapplied the property for purposes other than those for which he received it as agent or fiduciary, and an intent to restore or repay the property is not a defense to prosecution.

**Am Jur 2d, Embezzlement §§ 1 et seq.**

**Embezzlement by independent collector or collection agency working on commission or percentage. 56 ALR2d 1165.**

2. **Evidence and Witnesses § 967 (NCI4th)— receipts and copies of checks—business records exception—authentication**

Reservation deposit receipts, photographic copies of reservation deposit checks, and receipts for public offering statements seized by an officer from the model showroom office of a condominium project were admissible pursuant to the business records exception to the hearsay rule, and the officer was properly permitted to testify as to the names, dates and dollar amounts shown on each document, where the authenticity of the records was established by a condominium salesman's testimony that his own signature appeared on six of the reservation deposit receipts; he had received the deposit checks; all of the documents represented those kept by the condominium sales office in the course of a regularly conducted sale of a condominium unit and were created at the time of a sales transaction; and the office records were kept in the file compartment in the showroom. N.C.G.S. § 8C-1, Rule 803(6).

**Am Jur 2d, Evidence §§ 914 et seq.**

**Admissibility in state court proceedings of police reports as business records. 77 ALR3d 115.**

3. **Evidence and Witnesses § 299 (NCI4th)— exclusion of evidence — probative value outweighed by danger of misleading jury**

The trial court in an embezzlement prosecution did not abuse its discretion by refusing to permit an officer to testify that the failure to put condominium deposits in escrow in violation of N.C.G.S. § 47C-4-110 is not subject to criminal sanctions on the ground that, even if such testimony was relevant, its probative value was outweighed by the danger that it would mislead the jury. N.C.G.S. § 8C-1, Rule 403.

**Am Jur 2d, Evidence § 260.**

4. **Housing § 79 (NCI4th)— condominiums — refundable reservation deposit — 30-day wait — penalty — escrow requirement**

Where potential purchasers of condominium units were entitled to a full refund of their reservation deposits within thirty days of the seller's receipt of written notice of cancellation, the thirty-day wait period acts as a penalty because the potential purchasers lose interest on their money during that time. Therefore, the reservation deposits are not exempted from the public offering requirement of N.C.G.S. § 47C-4-101(b)(6) and are required by N.C.G.S. § 47C-4-110(a) to be placed in an escrow account.

Appeal by defendant from judgment entered 25 February 1991 by Judge W. Douglas Albright in Guilford County Superior Court. Heard in the Court of Appeals 2 February 1993.

*Attorney General Lacy H. Thornburg, by Special Deputy Attorney General Francis W. Crawley for the State.*

*Charles L. White for defendant-appellant.*

WYNN, Judge.

Defendant was indicted on forty counts of embezzlement on 5 July 1989. The jury returned verdicts of guilty on all counts. Twenty-one counts were consolidated for judgment and defendant was sentenced to seven years imprisonment. The remaining nineteen counts were consolidated for judgment and defendant was sentenced to five years imprisonment to begin at the expiration of the previously imposed sentence. From judgment and sentencing, defendant appeals.

The State's evidence tended to show the following. The embezzlement charges in this case arose out of activities involving defendant Larry Rupe and codefendant Reverend William L. Williams. The parties are in dispute and the evidence is unclear as to exactly when the defendants began working together. According to the State's brief, defendant and Mr. Williams began working together in 1985 organizing, developing, selling and managing the operation of condominium retirement communities in Georgia, Alabama, South Carolina and North Carolina. Apparently however, Mr. Williams had started the corporations prior to 1981 and defendant joined on in 1982 as an employee. Three separate corporations were later chartered in Georgia: Covenant Marketing Co., Covenant Development Co. and Covenant Management Co. Defendant became the president and owner of 30% of the stock of Covenant Marketing. He became the vice-president and owner of 10% of the stock of each of the latter two corporations. Codefendant Williams was the vice-president of Covenant Marketing and the president of the other two corporations. Williams and his family owned all remaining shares in the three corporations.

Covenant Development was organized to secure investors, consultants and contractors for the development of the retirement communities. Covenant Marketing was formed to market and sell the condominium units in the communities developed, and, Covenant Management was organized to manage the projects when complete. The three companies were interrelated through common owners, officers, staff and office space. In addition, monies from the companies were intermingled in a number of accounts.

Defendant's responsibilities, as president of Covenant Marketing, included managing sales of condominium units and training new salespersons. In addition, defendant was primarily responsible for keeping up with money that was accepted from potential purchasers as deposits. Williams was responsible for securing investors, contractors, consultants and financing. Williams received $5,000 per month salary and defendant received $3,500 per month salary and commissions as overrides.

By the mid 1980s, the Covenant Companies had developed several successful retirement condominium projects in several states. The standard procedure in developing a community involved hiring a marketing consultant to conduct a study of a potential area to determine whether a retirement community was needed and whether

it would be successful. If the consultant recommended building a retirement community, Williams would begin securing financing by establishing a limited partnership of investors which would own the project. Once the initial plans were complete, the company would build a model unit and sales office on the proposed site. Potential purchasers viewed the model, looked at plans, and if interested, reserved a unit by paying 5% of the purchase price as a deposit. In return, the buyer received a form acknowledging receipt of payment.

This procedure was followed when the Greensboro area was considered for potential development. Based upon a recommendation that Greensboro would be a successful area for development, an office opened in Greensboro in July 1987 and the "Carolina Glen" project was begun. Covenant Development was the general partner in Carolina Glen, controlling 90% of the limited partnership. In addition, there were initially 5 limited partners, each owning two percent.

Mr. and Mrs. Horace Bailes joined the sales staff to work in the Greensboro office. Mr. Bailes testified that defendant instructed the Bailes on the basics of sales procedure. The Bailes thereafter sold condo units to prospective purchasers and received a commission on each sale. Potential purchasers, after viewing a model unit, delivered a check payable to "Covenant Development Co. dba Carolina Glen" for 5% of the purchase price to reserve or hold a particular unit at Carolina Glen until the building was complete. In return, they received a reservation receipt signed by the salesperson involved and stating that the deposit was fully refundable by the seller within thirty days of receiving written notice. The purchaser was then required to pay another 5% when the contract for sale was signed. Defendant talked with the Bailes about opening a bank account in North Carolina for Carolina Glen and asked Mrs. Bailes to look into it. However, no account was opened while the Bailes were employed.

Reservation deposit checks were mailed to the corporate headquarters in Atlanta, Ga. In Atlanta, the checks were received by defendant or his secretary/assistant and given to the controller with instructions as to which account to make the deposit. Checks from Carolina Glen were recorded on the accounting books under marketing fees and classified as earned income. From July 1987 through October 1987, deposits from Carolina Glen were deposited

into the Covenant Development account at Bank South in Atlanta. The controller testified that he often transferred funds between 10 or 12 accounts as directed by the defendant and Williams.

"Retirement Community Living, Inc." (RCL) was incorporated by defendant in or around 1986 to take over the management of projects that Covenant Management had been managing but which were encountering financial difficulties. A corporate checking account in the name of RCL was opened with Wachovia Bank in Greensboro, North Carolina. Several reservation deposit checks payable to Covenant Development Company from the Carolina Glen project were deposited into the RCL account. In addition, RCL shared office space with the other Covenant Companies.

Williams, who previously pled guilty to charges of embezzlement testified for the State. According to his testimony, he was having trouble arranging financing and signing on limited partners to finance the Carolina Glen project. As a result, money from the RCL account representing deposits from Carolina Glen purchasers was borrowed to cover start-up expenses for the project. According to Williams, he and defendant knew that the money in the Wachovia account belonged to purchasers making deposits in Greensboro. They felt, however, that through the sale of the limited partnership interests the money would be replaced. But the partnerships were not in fact secured and the money was never replaced. As a consequence, several of the persons who had reserved units did not receive a refund of their prepaid deposit.

Greensboro police detective Glenn Knight interviewed defendant in Atlanta. Detective Knight testified regarding defendant's statement obtained during the interview. According to defendant's statement, the procedure being followed in Greensboro was to deposit the 5% reservation deposit in Atlanta. Individuals thereafter entering into a contract to purchase a unit would deliver a second check for another 5% to Covenant Development which was deposited in the RCL account at Wachovia in Greensboro. The purchaser in turn signed a receipt and received a public offering statement. The public offering statement contained a section stating that the deposit would be held in escrow pursuant to N.C. Gen. Stat. § 47C-4-110. A contract was also signed which stated that the initial deposit would be held in a savings account until a construction loan commitment was obtained for the Carolina Glen project, at which time the deposit would be returned to the purchaser.

Defendant's evidence tended to show that his primary work with the Covenant companies included marketing and management of resident services. He was not involved in the development aspects such as securing financing, partnerships and investors, and finding a location for a community to be developed. Williams controlled Covenant Marketing and defendant followed his instructions. Defendant was an officer in name only and signed documents for the corporation. Defendant formed RCL Inc. to enter into management agreements with completed facilities. RCL shared office space with the three Covenant companies. Defendant only did marketing for Carolina Glen after the Greensboro office opened.

Beginning in October 1987, the IRS seized the Covenant Development account and Williams instructed defendant to deposit money from Greensboro and elsewhere into the Trust Bank account in Atlanta for Covenant Marketing. In July 1988, deposits were switched from the Marketing account to the Wachovia account in Greensboro.

Defendant's motions to dismiss at the close of the State's evidence and at the close of all of the evidence were denied. The jury returned verdicts of guilty on all counts and judgments were entered thereon. Defendant appeals.

I.

[1] By defendant's first assignment of error he contends that the trial court erred in refusing to grant his motion to dismiss at the close of the State's evidence and at the close of all evidence. Defendant put on his own evidence, thereby waiving his motion to dismiss at the conclusion of the State's evidence. *State v. Britt*, 87 N.C. App. 152, 154, 360 S.E.2d 291, 292 (1987), *disc. rev. denied*, 321 N.C. 475, 364 S.E.2d 924 (1988). Thus we only address whether, based on all of the evidence presented at trial, it was error for the court to deny his motion to dismiss at the close of all of the evidence. *Id.*

On a motion to dismiss, the trial court's task is to determine whether there is substantial evidence of each essential element of the charged offense. *State v. Vines*, 317 N.C. 242, 253, 345 S.E.2d 169, 175 (1986). Substantial evidence is such evidence as a reasonable mind would accept as sufficient to support a conclusion. *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). All of the evidence actually admitted, both competent and incompetent may be considered. Such evidence should be viewed in the light

most favorable to the State, giving the State the benefit of every reasonable inference to be drawn therefrom. *State v. McKinney*, 288 N.C. 113, 117, 215 S.E.2d 578, 581-82 (1975). In addition, the court must consider any evidence presented by defendant which rebuts the inference of guilt so long as it is not contradicted by any of the State's evidence. *Britt*, 87 N.C. App. at 155, 360 S.E.2d at 292. If the State has offered substantial evidence of each essential element of the crime charged, the defendant's motion must be denied. *State v. Porter*, 303 N.C. 680, 685, 281 S.E.2d 377, 381 (1981).

N.C. Gen. Stat. § 14-90 defines the offense of embezzlement and requires the State to present proof of the following essential elements: (1) that the defendant, being more than 16 years of age, acted as an agent or fiduciary for his principal, (2) that he received money or valuable property of his principal in the course of his employment and by virtue of his fiduciary relationship, and (3) that he fraudulently or knowingly misapplied or converted to his own use such money or valuable property of his principal which he had received in his fiduciary capacity. *State v. Earnest*, 64 N.C. App. 162, 163-64, 306 S.E.2d 560, 562 (1983), *disc. rev. denied*, 310 N.C. 746, 315 S.E.2d 705 (1984); *State v. Kornegay*, 313 N.C. 1, 21, 326 S.E.2d 881, 896 (1985).

Defendant first argues that he did not hold an agency or fiduciary relationship with the principal as required by the statute. Specifically, he contends that his position was that of a vendor to the principal's vendee and as such, he was neither an agent nor fiduciary as to those purchasers named in the indictments. Defendant further argues that he was not directly involved in the sales transactions with purchasers. As a result, a fiduciary relationship did not exist between him and the prosecuting witnesses at the time they paid their deposits.

Our Courts have said that a person acts as an agent or fiduciary when another person places a special confidence in him and there is a duty created by his undertaking to act primarily for another's benefit. *State v. Seay*, 44 N.C. App. 301, 307, 260 S.E.2d 786, 789 (1979), *disc. rev. denied*, 299 N.C. 333, 265 S.E.2d 401, *cert. denied*, 449 U.S. 826, 66 L.Ed.2d 29 (1980). "It extends to any possible case in which a fiduciary relation exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other." *Id.* at 307-08, 260 S.E.2d at 790.

In the subject case, defendant held office as a vice-president in Covenant Development and Covenant Management and was president of Covenant Marketing. The evidence tends to show that defendant controlled the deposit of reservation funds and paid various corporate expenses which were unrelated to the development of Carolina Glen out of those funds. Therefore, defendant's promises, promotions, receipt and disbursement of money, and his positions in the Covenant corporations placed him in a fiduciary relationship with all of the investors and potential purchasers of Covenant properties.

Defendant next argues that the State failed to prove that he had the requisite criminal intent to fraudulently convert the funds at issue. The fraudulent intent required is the intent to willfully or corruptly use or misapply the property of another for purposes other than those for which the agent or fiduciary received it in the course of his employment. *Earnest*, 64 N.C. App. at 164, 306 S.E.2d at 562. It is not necessary that the State offer direct proof of fraudulent intent if facts and circumstances are shown from which it may be reasonably inferred. Further, it is not necessary to show defendant converted the property to his *own* use, provided the State shows defendant fraudulently or knowingly and willfully misapplied the property for purposes other than those for which he received it as agent or fiduciary. *State v. Melvin*, 86 N.C. App. 291, 298, 357 S.E.2d 379, 384 (1987). Finally, an intent to restore or repay the property embezzled is not a defense to prosecution. *State v. Agnew*, 294 N.C. 382, 390, 241 S.E.2d 684, 689, *cert. denied*, 439 U.S. 830, 58 L.Ed.2d 124 (1978).

Defendant in this case received, deposited and thereby controlled money paid by potential purchasers. When viewed in the light most favorable to the State, the evidence shows that the money was not held as promised; that defendant knowingly and willfully misapplied the money and as a result, it was not returned as promised upon demand to those who paid it. The funds were misapplied before the condos were underway and before proper financing was obtained. This evidence was sufficient to allow a reasonable inference to be drawn that the defendant either fraudulently or knowingly and willfully misapplied or converted funds of the investors and purchasers of the Carolina Glen project for improper purposes. Based on all of the evidence presented at trial, the trial judge did not err in denying the defendant's motion to dismiss.

II.

[2] By defendant's second assignment of error he contends that the trial court erred by admitting the hearsay-testimony of several witnesses not in court. The State presented evidence through Detective Glenn R. Knight regarding documents seized by him at the Carolina Glenn model showroom office on 15 May 1989. The documents generally included reservation deposit receipts, photographic copies of checks written to Covenant Development by potential purchasers as deposits, and receipts for public offering statements signed by the purchaser and salesperson.

Defendant argues that the court should not have permitted Detective Knight to identify the signatures on the checks or otherwise testify as to deposits from purchase transactions for which he was not a participant and had no first-hand knowledge. The State argues that the documents were admissible pursuant to the business records exception to the hearsay rule. We agree.

Rule 803(6) of the North Carolina Rules of Evidence is the business records exception to the hearsay rule and provides:

Records of Regularly Conducted Activity.—A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, . . . made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

The State's evidence tended to show that the documents were seized by Detective Knight in a brown wood-grained file box and remained unaltered throughout the period he held them prior to trial. The documents were arranged in the box in general alphabetical order according to the names of purchasers of units at Carolina Glen. Defendant objected to the introduction of some of these documents, labeled exhibits 45A through G, on the grounds that the purchasers had not testified to the authenticity of the documents relating to their purchase at Carolina Glen. Defendant agreed to allow Detective Knight to go through the exhibits describing the

names, dates and dollar amounts reflected on each individual document, on the premise that the documents later be authenticated.

The authenticity of business records may be established by a witness who is familiar with them and the system under which they were made, or by circumstantial evidence. *State v. Wilson*, 313 N.C. 516, 533, 330 S.E.2d 450, 462 (1985). It is not necessary that the records be authenticated by the person who made them. In fact, if the records themselves show that they were made at or near the time of the transaction in question, the authenticating witness need not testify from personal knowledge that they were made at that time. *Id.*

After Knight's testimony, the State recalled Mr. Bailes, the salesperson for six of the seven transactions in question, to testify as to the circumstances under which the documents were created. Bailes identified his own signature on six of the reservation deposit receipts and verified that he had received the checks which Detective Knight had discussed during his testimony. Bailes stated that all of the documents represented those kept by the Carolina Glen sales office in the course of a regularly conducted sale of a condominium unit and were created at the time of a sales transaction. He further testified that the office records were kept in the file compartment in the showroom. As one "familiar with the business entries and the system under which they were made," Bailes was a "qualified witness" to show that "it was the regular practice" of salespersons at Carolina Glen to create the documents in question during a sales transaction. Bailes testimony, coupled with the dates and signatures on the documents themselves are sufficient to establish that all of the documents were made and kept in the regular course of business at or near the time of each reservation or sale of a condominium unit.

III.

[3] Defendant's third assignment of error argues that the trial court committed reversible error by refusing to allow Detective Knight to testify that a violation of N.C. Gen. Stat. § 47C-4-110, for failure to put money in escrow, is not subject to criminal sanctions. He contends that this evidence was relevant to counter testimony for the State which tended to show that the reservation deposits should have gone into escrow.

Evidence is admissible at trial if it is relevant and its probative value is not substantially outweighed by, among other things, the danger that it will confuse or mislead the jury. N.C. Gen. Stat. § 8C-1, Rules 402 and 403; *State v. Knox*, 78 N.C. App. 493, 337 S.E.2d 154 (1985). Relevant evidence is defined as "any evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401. Whether or not to exclude evidence under Rule 403 is a matter within the sound discretion of the trial court, and the trial judge's ruling may be reversed for an abuse of discretion only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision. *State v. Jones*, 89 N.C. App. 584, 367 S.E.2d 139 (1988).

After substantial argument by counsel for both parties at trial, the trial judge found that permitting such testimony would be "absolutely . . . misleading to the jury." The judge stated, "Even if that's relevant, the probative value is substantially outweighed by the danger of confusion of the issues and absolutely misleading of [sic] the jury on what you're inquiring about, and I'm going to sustain it and keep it out . . . ." We agree with the conclusion of the trial judge and therefore hold that he did not abuse his discretion by refusing to admit the testimony of Detective Knight as to whether the Condominium statute is criminal in nature. This assignment of error is without merit.

## IV.

[4] Defendant's fourth assignment of error argues that the trial court erred in refusing to grant his motion in limine to exclude evidence indicating that N.C. Gen. Stat. § 47C-4-110, the condominium statute, required the defendant to place the reservation deposits paid by potential purchasers in escrow. Defendant argues that the initial 5% deposit paid by potential purchasers to reserve a unit was not subject to the escrow deposit requirements of Chapter 47C, the Condominium Act. We disagree.

N.C. Gen. Stat. § 47C-4-110(a) states:

*Any deposit* made in connection with the purchase or *reservation* of a unit from a person required to deliver a public offering statement pursuant to G.S. 47C-4-102(c) shall be immediately deposited in a trust or escrow account in an insured bank

or savings and loan association in North Carolina and shall remain in such account for such period of time as a purchaser is entitled to cancel pursuant to G.S. 47C-4-108 or cancellation by the purchaser thereunder whichever occurs first. Payments held in such trust or escrow accounts shall be deemed to belong to the purchaser and not the seller.

Defendant argues that this provision only requires escrow deposits for transactions which in turn require a Public Offering Statement. N.C. Gen. Stat. § 47C-4-101(b)(6) provides that "[n]either a public offering statement nor a resale certificate need be prepared or delivered in the case of a disposition which is subject to cancellation at any time for any reason by the purchasers without penalty." Defendant contends that whereas the 5% reservation deposits at issue were subject to cancellation at any time for any reason by the purchaser without penalty, they are exempted from the public offering requirement by N.C. Gen. Stat. § 47C-4-101(b)(6) and accordingly exempted from the escrow requirements of N.C. Gen. Stat. § 47C-4-110(a).

Upon payment of the 5% deposit to reserve a unit at Carolina Glen, the potential purchaser received a reservation receipt, signed by the salesperson, which stated that the purchaser was entitled to a full refund from the seller within 30 days of the seller's receipt of written notice of cancellation. The State argues, and we agree, that the thirty day wait period following written notice of cancellation acts as a penalty during which time the potential purchasers lose interest on their money. As a result, the reservation deposit does not fall within the public offering exemption.

The North Carolina General Assembly enacted the North Carolina Condominium Act in 1986, based on the Uniform Condominium Act. The significant innovation of the Act is its protection of the consumer, provided in Article 4 which is entitled "Protection of Purchasers." N.C. Gen. Stat. § 47C-4. The Act provides protection for the consumer both as a potential purchaser and as an owner. James H. Jeffries IV, Note, *North Carolina Adopts the Uniform Condominium Act*, 66 N.C. L. Rev. 199, 221 (1987).

The commentary to section 47C-4-110 lends credence to the view that the language of that section requires that the reservation deposits in question be placed in an escrow account. Although the commentary is not binding when not enacted into law, where proper, it may be given substantial weight in discerning legislative

intent. *State v. Bogel*, 324 N.C. 190, 202 n.5, 376 S.E.2d 745, 752 n.5 (1989). In adopting the Uniform Condominium Act, the legislature directed that all relevant portions of the Official Commentary be included where appropriate to "explain or illustrate" portions of the Act. 1986 N.C. Sess. Laws ch. 877, § 2. Thus, in our efforts to determine the intent of the legislature, we accord considerable significance to the commentary to the Uniform Condominium Act.

Comment 1 of the Official Comment states that section 47C-4-110 "applies to the sale by persons required to furnish public offering statements of residential units and of non-residential units unless waived pursuant to the provisions of Section 4-101." Comment 3 then states that the "escrow requirements of this section apply in connection with *any* deposit made by a purchaser, whether such deposit is made pursuant to a binding contract *or pursuant to a non-binding reservation agreement (with respect to which no public offering statement is required under Section 4-101(b)(6) )*." The North Carolina Comment to § 47C-4-110 provides:

> [t]his section was rewritten to make it clear that the escrow period referred to is the period during which the *purchaser has the right to cancel*. The last sentence of subsection (a) is to negate any reference or argument in favor of ownership or right of possession to the deposit on the part of anyone other than the purchaser.

The purpose of the Uniform Condominium Act is to protect the purchaser from precisely the outcome that occurred in this case. The potential purchasers clearly had a right to cancel and obtain a refund of their reservation deposit. In accord, the deposit money given to reserve a unit was still rightfully owned by the purchaser. To ensure that those funds are available to consumers who decide to exercise their right to cancel, the statute requires that the funds be placed in escrow. It follows that it was not error for the trial judge to deny defendant's motion in limine to exclude evidence indicating such a requirement.

V.

Defendant's final assignment of error contends that the trial court erred by failing to charge the jury as requested, that there is no legal duty to escrow money paid as a reservation deposit when the reservation agreement is a non-binding agreement paid in advance. Based on the foregoing conclusion that N.C. Gen. Stat.

§ 47C-4-110, requires that both reservation and contract deposits should be placed in escrow upon receipt, defendant's assignment of error regarding the charge to the jury is without merit.

No Error.

Judges EAGLES and ORR concur.