IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-39

No. COA20-894

Filed 18 January 2022

Pamlico County, Nos. 19 CRS 66–67

STATE OF NORTH CAROLINA

v.

THOMAS WAYNE STEELE

Appeal by defendant from judgments entered 31 January 2020 by Judge John E. Nobles, Jr., in Pamlico County Superior Court. Heard in the Court of Appeals 19 October 2021.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Amy Kunstling Irene, for the State.*

*Tin Fulton Walker & Owen, PLLC, by Noell P. Tin, for defendant-appellant.*

ZACHARY, Judge.

¶ 1     Defendant Thomas Wayne Steele appeals from judgments entered upon a jury's verdicts finding him guilty of one count of embezzlement and four counts of exploitation of an older adult. On appeal, Defendant contends that the trial court erred by (1) denying his motion to dismiss the embezzlement charge for insufficient evidence, and (2) declining to give Defendant's proposed special jury instruction. After careful review, we conclude that Defendant received a fair trial, free from prejudicial error.

### *Background*

¶ 2          Defendant first met Lillie Monk and her late husband, Pastor Mike Monk, Jr., in 1985. They became very close, eventually considering themselves family; Defendant called Mrs. Monk and Pastor Monk "Mom" and "Dad," and the Monks referred to Defendant as their "son." On 28 March 2015, Pastor Monk passed away unexpectedly. Defendant, who was also a pastor, delivered the eulogy at Pastor Monk's funeral.

¶ 3          Mrs. Monk struggled to return to her daily life. She testified that her husband's death "almost took [her] out[,]" and she felt like she "couldn't make it without him[.]" Mrs. Monk's family was concerned about her because she was so "grief-stricken" and "distraught."

¶ 4          Following the funeral, Mrs. Monk visited Defendant and his wife for a week in their home in Concord, North Carolina, against her family's advice. Over the next few months, she stayed with Defendant and his wife periodically. Defendant told Mrs. Monk that "he was there to help" her. Mrs. Monk testified at trial that she "thought [Defendant] was a man of God" who "loved [her]" and was "going to take care of [her.]" Mrs. Monk had little experience managing the household finances, as that had been her husband's responsibility throughout their marriage. Because she trusted Defendant and thought of him as family, Mrs. Monk "just turned everything"—

including the keys to her home and post office box—over to Defendant after Pastor Monk's death.

¶ 5        On 16 April 2015, less than a month after her husband's death, Mrs. Monk added Defendant as joint holder on her State Employees' Credit Union (SECU) savings and money-market accounts. She also redeemed over $146,000 in savings bonds and deposited that money into the joint money-market account. That same day, Mrs. Monk added Defendant as a joint holder on her First Citizens Bank accounts as well. In addition, at some point, Defendant linked his personal SECU accounts to Mrs. Monk's SECU accounts, with the effect that any overdrafts on Defendant's personal SECU account would be paid from the joint SECU accounts funded with Mrs. Monk's money.

¶ 6        Shortly thereafter, on 12 June 2015, Defendant drove Mrs. Monk to an attorney's office. Mrs. Monk testified that at Defendant's behest, she executed a power of attorney naming Defendant as her attorney-in-fact. She also executed a will, naming Defendant to serve as her executor and leaving the majority of her estate to him.

¶ 7        A few months later, on 4 September 2015, funds were withdrawn from the joint First Citizens accounts and used to fund two bank accounts at Wells Fargo Bank. Mrs. Monk and Defendant were named as joint holders of the new Wells Fargo accounts. There was conflicting evidence as to who opened the Wells Fargo accounts.

Defendant testified that Mrs. Monk agreed to open these joint accounts. Mrs. Monk testified that the signatures on the applications for the two Wells Fargo accounts did not look like her handwriting; that she did not give Defendant permission to open the Wells Fargo accounts; and that she "didn't know what was going on" with the Wells Fargo accounts because Defendant "took over."

¶ 8        Concerned that Defendant was committing financial crimes against Mrs. Monk, her brother contacted the Pamlico County Sheriff's Office, which transferred the case to Agent Kevin Snead at the State Bureau of Investigation. On 22 April 2019, a Pamlico County grand jury returned indictments charging Defendant with four counts of exploitation of an older adult and one count of embezzlement of $100,000 or more. On 21 October 2019, a Pamlico County grand jury returned a superseding indictment amending the range of dates alleged for one of the charges of exploitation of an older adult.

¶ 9        On 28 January 2020, this matter was called for trial in Pamlico County Superior Court, the Honorable John E. Nobles, Jr., presiding. At trial, SBI Agent Snead testified that Defendant obtained a total of $123,367.09 from the accounts that he held with Mrs. Monk.

¶ 10        Agent Snead explained that, because Defendant linked his personal SECU checking account to Mrs. Monk's now jointly held SECU accounts, SECU transferred $21,350 from the joint money-market account to Defendant's personal checking

account to cover his overdrafts between 11 August 2015 and 11 May 2016. He also testified that Defendant used $102,017 of Mrs. Monk's money from the jointly-held SECU, Wells Fargo, and First Citizens accounts for his benefit, including $15,000 for a down payment on a Ford truck titled to Defendant; $6,000 in contributions to his IRA; $4,850 for repairs to his Mercedes; $8,000 in payments on his credit card account; and $25,250 in cash withdrawals.

¶ 11        Defendant testified that the money in the joint accounts belonged to Mrs. Monk, stating, "it was her money—her accounts, her money. I was there to help her. It wasn't about me." He maintained that he had "no idea" that SECU was transferring money from the SECU accounts that he held with Mrs. Monk to cover overdrafts from his personal checking account, because he had not reviewed the SECU statements and instead "just stuck them in a drawer." Defendant also testified that Mrs. Monk asked him to recruit a new pastor for Pastor Monk's church and agreed to fund that project, and that he withdrew money from the accounts as she requested. However, Defendant conceded that he suffered from financial difficulties. Although his annual salary was $80,000, he had to pay the IRS "a bunch of money back" at one time and had struggled with his finances and bookkeeping.

¶ 12        Mrs. Monk testified that, although she "just turned everything over" to Defendant after her husband's death, she never authorized Defendant to link his personal SECU checking account to any joint account in order to cover his overdrafts,

never gave Defendant permission to withdraw money from the joint accounts for his personal use, and never requested that Defendant find a new pastor for the church. She also stated that she never gave Defendant permission to use her money to purchase a new truck or to fix his Mercedes.

¶ 13        At the close of the State's evidence, Defendant moved to dismiss the embezzlement charge due to insufficient evidence, and he renewed the motion at the close of all evidence. The trial court denied the motion both times.

¶ 14        At the charge conference, Defendant submitted a written request for the following special jury instruction with regard to the embezzlement charge:

> Pursuant to NC law, NCGS [§] 54C-165, Any two or more persons may open or hold a withdrawable account or accounts. The withdrawable account and any balance of the account is held by them as joint tenants. You should consider this as well as all other evidence as you evaluate whether the State has proven its case beyond a reasonable doubt.

¶ 15        Defense counsel argued that the proposed special instruction was necessary because "if the jury finds that [Defendant] was lawfully on the joint accounts, meaning that there was no deception involved, then he would have been entitled to use those funds regardless." The trial court denied Defendant's request on the grounds that the special instruction was likely to confuse the jury.

¶ 16        On 31 January 2020, the jury returned its verdicts finding Defendant guilty of all charges. The trial court sentenced Defendant to 6-17 months for three of the four

counts of exploitation of an older adult and an additional 13-25 months for the fourth count, with the sentences to run consecutively in the custody of the North Carolina Division of Adult Correction. The court also sentenced Defendant to 73-100 months for the embezzlement conviction, to run concurrently with Defendant's other sentences. In addition, the court ordered Defendant to pay $123,367.09 in restitution to Mrs. Monk. Defendant entered oral notice of appeal in open court.

## *Discussion*

On appeal, Defendant argues that the trial court erred by (1) denying his motion to dismiss the embezzlement charge, and (2) declining to deliver his requested special jury instruction. We disagree.

### I. *Motion to Dismiss*

Defendant contends that the trial court erred in denying his motion to dismiss because the State presented insufficient evidence that (1) he had a fiduciary relationship with Mrs. Monk when he converted the funds to his use; (2) he wrongfully converted Mrs. Monk's money to his own use, when he was entitled to the funds in the bank accounts as a joint holder; and (3) Defendant embezzled at least $100,000.

### A. *Standard of Review*

We review the denial of a motion to dismiss based on an insufficiency of evidence de novo. *State v. Parker*, 233 N.C. App. 577, 579, 756 S.E.2d 122, 124 (2014).

"A motion to dismiss is properly denied where there is substantial evidence of each element of the offense charged and of [the] defendant being the perpetrator of that offense." *Id.* "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation and internal quotation marks omitted). The evidence "should be viewed in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn therefrom. Where the State offers substantial evidence of each essential element of the crime charged, [the] defendant's motion to dismiss must be denied." *Id.* (citation omitted).

*B. Embezzlement*

The felony offense of embezzlement applies to any person "[w]ho is a guardian, administrator, executor, trustee, or any receiver, or any other fiduciary[.]" N.C. Gen. Stat. § 14-90(a)(3) (2019). Our embezzlement statute also provides that:

> (b) Any [fiduciary] who shall:
>
> (1) Embezzle or fraudulently or knowingly and willfully misapply or convert to his own use, or
>
> (2) Take, make away with or secrete, with intent to embezzle or fraudulently or knowingly and willfully misapply or convert to his own use,
>
> any money, goods or other chattels, bank note, check or order for the payment of money issued by or drawn on any bank or other corporation, or any treasury warrant, treasury note, bond or obligation for the payment of money issued by the United States or by any state, or any other

valuable security whatsoever that . . . belongs to any other
person or corporation, unincorporated association or
organization . . . , which shall have come into his possession
or under his care, shall be guilty of a felony.

*Id.* § 14-90(b). In short, "to constitute embezzlement, the property in question initially must be acquired lawfully, pursuant to a trust relationship, and then wrongfully converted." *State v. Speckman*, 326 N.C. 576, 578, 391 S.E.2d 165, 166 (1990). If the value of the property embezzled is $100,000 or more, the offense constitutes a Class C felony. N.C. Gen. Stat. § 14-90(c).

*C. Fiduciary Relationship*

Defendant first argues that the trial court erred in denying his motion to dismiss because the State presented insufficient evidence that a fiduciary relationship existed between himself and Mrs. Monk. Specifically, Defendant contends that "[n]o such relationship existed . . . until the power of attorney was executed on June 12, 2015, approximately two months after [Defendant] came into possession of the funds in Mrs. Monk's bank accounts[.]" We disagree.

It is axiomatic that "[t]he relationship created by a power of attorney between the principal and the attorney-in-fact is fiduciary in nature[.]" *Albert v. Cowart*, 219 N.C. App. 546, 554, 727 S.E.2d 564, 570 (2012). However, a fiduciary relationship may arise "under a variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound

to act in good faith and with due regard to the interests of the one reposing confidence." *State v. Seay*, 44 N.C. App. 301, 307, 260 S.E.2d 786, 789 (1979) (citation omitted), *appeal dismissed and disc. rev. denied*, 299 N.C. 333, 265 S.E.2d 401, *cert. denied*, 449 U.S. 826, 66 L. Ed. 2d 29 (1980). Indeed, as this Court explained in *State v. Newell*:

> In determining whether an agency or fiduciary relationship exists, it is the terms of the relationship that are important and not how the relationship is designated. The question which determines the nature of the relationship between the defendant and the alleged victim is the ownership of the money at the time it came into the hands of the defendant.

189 N.C. App. 138, 141, 657 S.E.2d 400, 403 (2008) (citation and internal quotation marks omitted).

¶ 24        Here, Defendant concedes that he acted as Mrs. Monk's fiduciary *after* she executed the power of attorney naming Defendant as her attorney-in-fact. Nevertheless, the evidence sufficiently established that a fiduciary relationship existed between Defendant and Mrs. Monk prior to that point, when he "came into possession of the funds in Mrs. Monk's bank accounts[.]" The parties' relationship was certainly one of special confidence and trust: Defendant called Mrs. Monk "Mom," and she called him "son." Mrs. Monk "thought he was a man of God" who "loved" and was "going to take care of" her. Defendant told Mrs. Monk that "he was there to help" her. Only a few weeks after her husband's funeral, Mrs. Monk granted Defendant

access to her accounts in reliance on Defendant's promise to "take care of" her. She "turned everything over" to Defendant—including the keys to her home and post office box.

Mrs. Monk clearly granted Defendant access to the funds in her bank accounts "pursuant to a trust relationship[.]" *Speckman*, 326 N.C. at 578, 391 S.E.2d at 166. Because Defendant and Mrs. Monk had a relationship of trust, and because "it is the terms of the relationship that are important and not how the relationship is designated[,]" *Newell*, 189 N.C. App. at 141, 657 S.E.2d at 403 (citation omitted), we conclude that there was sufficient evidence that Defendant was acting as Mrs. Monk's fiduciary when he gained access to her money.

### D. Joint Ownership of Bank Accounts

Defendant next argues that the trial court erred in denying his motion to dismiss because there was insufficient evidence that Defendant wrongfully converted Mrs. Monk's money to his own use, in that "[a]s a holder of the [joint] accounts, [he] was entitled to the balance of the [joint] accounts" that he held with Mrs. Monk. Again, we disagree.

In support of his theory of the case, Defendant relies on N.C. Gen. Stat. § 54C-165(a), which provides, *inter alia*:

> Any two or more persons may open or hold a withdrawable account or accounts. The withdrawable account and any balance of the account is held by them as joint tenants, with

> or without right of survivorship, as the contract shall
> provide. . . . Unless the persons establishing the account
> have agreed with the savings bank that withdrawals
> require more than one signature, payment by the savings
> bank to, or on the order of, any persons holding an account
> authorized by this section is a total discharge of the savings
> bank's obligation as to the amount so paid.

N.C. Gen. Stat. § 54C-165(a).

¶ 28        Defendant interprets this statute as granting joint ownership of the funds

deposited into the accounts by virtue of his being named a joint holder. Consequently,

Defendant maintains that as a joint holder of the accounts, he was an owner of the

funds, and thus, he could not be prosecuted for unlawful withdrawal and use of the

funds. This contention is without merit.

¶ 29        Although § 54C-165 governs savings banks, it is essentially the same as § 53C-

6-6 (formerly § 53-146, governing banks) and § 54-109.58 (governing credit unions).

*See id.* §§ 53C-6-6(f); 54-109.58(f); 54C-165(a). These statutes simply provide, in sum,

that the financial institution "may safely pay either of the two persons." *O'Brien v.*

*Reece*, 45 N.C. App. 610, 617, 263 S.E.2d 817, 821 (1980). It is well established that

these statutes are "for the protection of the [financial institution] only, and absent

any other evidence, [are] not dispositive as to the ownership of funds." *Id.*

¶ 30        It is true that "[t]he ownership of funds in a bank account is presumed to belong

to or be owned by the person(s) named on the account." *Mut. Cmty. Sav. Bank, S.S.B.*

*v. Boyd*, 125 N.C. App. 118, 122, 479 S.E.2d 491, 493 (1997). Nevertheless, where

ownership is disputed, the presumption may be rebutted with evidence of the "facts surrounding the creation and history of the account, the source of the funds, the intent of the depositor[,] the nature of the bank's transactions with the parties, and whether the owner of the monies . . . intended to make a gift to the person named[.]" *Id*. at 122, 479 S.E.2d at 494 (citations omitted). "The depositor is . . . deemed to be the owner of the funds." *Myers v. Myers*, 68 N.C. App. 177, 181, 314 S.E.2d 809, 812 (1984) (concluding that husband's unauthorized removal and use of funds deposited by wife in a joint checking account supported a claim of conversion). "[A] deposit by one party into an account in the names of both, standing alone, does not constitute a gift to the other. In order for the exchange of property to constitute a gift, there must be donative intent coupled with loss of dominion over the property." *Hutchins v. Dowell*, 138 N.C. App. 673, 678, 531 S.E.2d 900, 903 (2000). The intent of the parties controls when ownership is disputed. *McAulliffe v. Wilson*, 41 N.C. App. 117, 120, 254 S.E.2d 547, 549 (1979).

¶ 31 In the instant case, it is undisputed that Mrs. Monk, alone, funded the joint accounts. Indeed, Defendant testified that all of the money in the accounts "was [Mrs. Monk's] money." Thus, Mrs. Monk, as the depositor, was "still deemed to be the owner of the funds." *Myers*, 68 N.C. App. at 181, 314 S.E.2d at 812.

¶ 32 Moreover, there was ample evidence that Mrs. Monk did not intend to make a gift to Defendant of $123,367.09, the total amount of funds that Defendant was

eventually convicted of embezzling from her. Mrs. Monk testified that she did not give Defendant permission to use the funds for his personal expenses, nor did she gift him the money. Although there was contrary evidence presented at trial—Defendant testified that Mrs. Monk did, in fact, authorize his particular use of the funds—in reviewing the denial of a motion to dismiss, we nonetheless must "view [the evidence] in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn therefrom." *Parker*, 233 N.C. App. at 579, 756 S.E.2d at 124.

¶ 33        We conclude that there was sufficient evidence that the funds taken were the property of Mrs. Monk, and that she did not have the requisite "donative intent" to grant Defendant the money to withdraw and use for his personal benefit. *Hutchins*, 138 N.C. App. at 678, 531 S.E.2d at 903. Thus, Defendant was not entitled to convert the money to his use without her permission.

### E. Amount Embezzled

¶ 34        Defendant also contends that the State presented insufficient evidence that the amount of money he embezzled was $100,000 or more—thus elevating the offense to a Class C felony—because: (1) less than $100,000 was taken while Defendant acted as a fiduciary to Mrs. Monk; and (2) Defendant did not have the requisite intent to embezzle the overdraft fees, and therefore, the amount of money embezzled was less than $100,000. We disagree with both contentions.

¶ 35     Defendant first argues that the trial court erred in denying his motion to dismiss the Class C embezzlement charge, because there was insufficient evidence that Defendant was acting as a fiduciary when he converted $100,000 or more of Mrs. Monk's funds to his personal use. As explained above, there was sufficient evidence that Defendant was acting as Mrs. Monk's fiduciary prior to his appointment as her attorney-in-fact. The wrongful conversion of $123,367.09 occurred while Defendant acted as a fiduciary. Accordingly, this argument fails.

¶ 36     Second, Defendant maintains that there was insufficient evidence that he had the requisite intent to wrongfully convert $21,350 in transfers from a joint account in order to cover overdraft fees in his personal checking account. Defendant asserts that "[t]here was no evidence that [he] initiated or knowingly allowed those transfers, nor was there evidence that [he] was aware of those transfers when they occurred" or that "he knowingly linked the joint account to his personal account" with the intent of instituting the overdraft transfers.

¶ 37     "The fraudulent intent required [for the offense of embezzlement] is the intent to willfully or corruptly use or misapply the property of another for purposes other than those for which the agent or fiduciary received it[.]" *State v. Rupe*, 109 N.C. App. 601, 609, 428 S.E.2d 480, 486 (1993). "When a defendant receives money under an agency relationship and does not transmit it to the party to whom it is due, this is circumstantial evidence of intent. Evidence that the defendant was experiencing

personal financial problems is also circumstantial evidence of intent." *Newell*, 189 N.C. App. at 142–43, 657 S.E.2d at 404 (citations omitted).

¶ 38       Here, there was sufficient evidence of Defendant's fraudulent intent to embezzle $21,350 in overdraft fees from Mrs. Monk. Although Defendant denied linking the accounts or knowing that his personal checking account overdrafts were being covered with funds from a joint account, the $21,350 in overdraft fees constituted more than a quarter of his approximately $80,000 annual salary, and Defendant admitted receiving SECU statements for that account. Moreover, transfers from the joint account covered Defendant's personal overdrafts for many months, from August 2015 to May 2016, with each month's statements providing Defendant with additional notice of the transfers. Defendant also testified that he was experiencing money problems, as he struggled with his finances and bookkeeping, and had to pay the IRS "a bunch of money back" at one time.

¶ 39       The evidence was sufficient to support that Defendant embezzled $100,000 or more from Mrs. Monk. Accordingly, the trial court did not err in denying Defendant's motion to dismiss the charge of embezzlement.

## II. *Special Jury Instruction*

¶ 40       Finally, Defendant argues on appeal that the trial court erred in declining to give his requested special jury instruction that "if the jury found that he was lawfully named on the joint bank accounts with [Mrs.] Monk, then he would be entitled to use

the funds in the accounts[.]" A review of the record, however, reveals that Defendant's requested special instruction was in fact a brief summary of N.C. Gen. Stat. § 54C-165; counsel had intended to use this statute to argue that Defendant was not guilty of the embezzlement charge. We conclude that the trial court did not err in denying Defendant's request for this special instruction.

*A. Standard of Review*

A trial court should give a specific jury instruction when "(1) the requested instruction [i]s a correct statement of law and (2) [i]s supported by the evidence, and . . . (3) the [pattern jury] instruction . . . , considered in its entirety, fail[s] to encompass the substance of the law requested and (4) such failure likely misle[ads] the jury." *State v. Oxendine*, 242 N.C. App. 216, 219, 775 S.E.2d 19, 21–22 (2015) (citation omitted). "Where the request for a specific instruction raises a question of law," this Court reviews de novo "the trial court's decisions regarding jury instructions[.]" *State v. Palmer*, 273 N.C. App. 169, 171, 847 S.E.2d 449, 451 (2020). "Failure to give a requested and appropriate jury instruction is reversible error if the requesting party is prejudiced as a result of the omission." *State v. Guerrero*, 2021-NCCOA-457, ¶ 9 (citation omitted).

*B. Discussion*

During the charge conference, Defendant requested that the trial court instruct the jury that:

> Pursuant to NC law, NCGS [§] 54C-165, Any two or more persons may open or hold a withdrawable account or accounts. The withdrawable account and any balance of the account is held by them as joint tenants. You should consider this as well as all other evidence as you evaluate whether the State has proven its case beyond a reasonable doubt.

Defendant requested this special instruction in the hopes of arguing to the jurors that if they found that Defendant "was lawfully on the joint accounts, meaning that there was no deception involved," then they should also find that "he would have been entitled to use those funds regardless."

¶ 43        Defendant's requested special instruction is a correct statement of law insofar as "[a]ny two or more persons may open or hold a withdrawable account or accounts. The withdrawable account and any balance of the account is held by them as joint tenants[.]" N.C. Gen. Stat. § 54C-165(a). It does not, however, accurately negate any element of the offense of embezzlement; Defendant was not entitled to spend the funds because he was a joint holder of the accounts. Consequently, the trial court correctly concluded that such an instruction would have been confusing to the jury.

¶ 44        As we addressed above, N.C. Gen. Stat. § 54C-165 and its related statutes, §§ 53C-6-6 and 54-109.58, are "for the protection of the *bank* only, and absent any other evidence, [are] *not dispositive as to the ownership of funds*." *O'Brien*, 45 N.C. App. at 617, 263 S.E.2d at 821 (emphases added). Furthermore, Defendant admitted at trial that all of the money in the joint accounts belonged to Mrs. Monk: "[I]t was

her money—her accounts, her money. I was there to help her. It wasn't about me." Mrs. Monk testified that she granted Defendant joint access so that he could "take care of [her]."

¶ 45     Additionally, Defendant can show no prejudice from the trial court's refusal to give the requested special instruction. Indeed, the requested instruction actually *supports* an element of the offense of embezzlement—that Defendant had lawful access to the funds. *See* N.C. Gen. Stat. § 14-90; *Speckman*, 326 N.C. at 578, 391 S.E.2d at 166. Thus, there is no reasonable possibility that, had the trial court given the requested special instruction, the jury would have reached a different result at trial. Moreover, it is evident upon review that the trial court appropriately instructed the jury.

¶ 46     Because the requested special instruction could have misled the jury and was likely to create an inference unsupported by the law and the record—that Defendant's lawful access to the funds in the joint accounts entitled him to freely spend the money therein—the trial court properly declined to deliver Defendant's requested special jury instruction. *See Guerrero*, 2021-NCCOA-457 at ¶ 9.

### *Conclusion*

¶ 47     For the foregoing reasons, we conclude that the trial court did not err in denying Defendant's motion to dismiss the embezzlement charge, nor in refusing to deliver Defendant's requested special jury instruction.

NO ERROR.

Judges MURPHY and COLLINS concur.